UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Ulrich Felix Anton Engler and				Case No. 9:08-bk-04360-MGW
Private Commercial Office, Inc.,			Chapter 7

    Debtor.
_____/

Robert E. Tardif, Jr., as Trustee for
the Chapter 7 Bankruptcy Estates
of Ulrich Felix Anton Engler and
Private Commercial Office, Inc.,

    Plaintiff,

vs.							Adv. Pro. No.: 9:10-ap-00648-MGW

St. John the Evangelist Catholic Church,

    Defendant.
_____/

**MEMORANDUM OPINION ON
<u>CROSS MOTIONS FOR SUMMARY JUDGMENT</u>**

Under Bankruptcy Code section 550(a)(1), a trustee can recover the value of a fraudulent transfer from an initial transferee unless the initial transferee served as a mere conduit for the fraudulent transfer and otherwise acted in good faith. Here, the Debtors fraudulently transferred funds to the Defendant. Although the funds were deposited into the Defendant's general operating account, the Defendant had no right to use the funds. The funds were specifically earmarked for a third-party charitable organization. The Defendant was required to, and in fact did, separately account for the funds it received from the Debtors. And the Defendant ultimately transferred the funds to the third-party charitable organization as directed. Under these circumstances, the Court concludes that the Defendant was a mere conduit for the fraudulent

transfer and otherwise acted in good faith. Accordingly, the Court will enter summary judgment in favor of the Defendant.

## Background

Ulrich Felix Anton Engler ("Engler"), a German national, perpetrated a massive Ponzi scheme bilking investors out of approximately $170 to $350 million. Engler created Private Commercial Office, Inc. ("Private Commercial") to perpetrate the scheme. (Engler and Private Commercial are collectively referred to as the "Debtors.") St. John the Evangelist Catholic Church (the "Church") is a religious institution located in Naples, Florida. The Church is part of the Diocese of Venice (the "Diocese").

In October 2006, a group of Church parishioners created the Jamaica Outreach Program, Inc. ("JOP"), a non-profit organization, to raise money for Food for the Poor, an international faith-based charitable organization.[1] Food for the Poor was raising money for its Jamaica Housing Project (the "Project"), a program to build homes for poor Jamaican residents. The JOP had not obtained its 501(c)(3) tax exempt status by the time it began soliciting donations for the Project from Church parishioners and members of the community.[2] So the JOP asked the Church if it would receive the donations on the JOP's behalf.[3] The Church agreed.[4]

Between Fall 2006 and Spring 2007, the Church received numerous donations for the Project from Church parishioners and other members of the community. One of those donations was from the Debtors. The Debtors made a $62,500 donation to the Church on November 23,

---

[1] Adv. Doc. No. 13-1 at 2, ¶ 4.

[2] Adv. Doc. No. 30-1 at p. 14, ll. 14-23.

[3] *Id.* at p. 14, ll. 14-23.

[4] *Id.* at p. 15, ll. 20-25.

2006.[5] Because the donations for the Project were made directly to the Church, the JOP instructed donors to designate in the memo line of their checks that their donation was earmarked for the Project. The Debtors, as instructed, specifically earmarked their contribution for the Project: the memo line of the check specifically stated "Jamaica Housing Project."[6]

The Church believed it was not permitted, under the Diocese's accounting rules, to set up a separate account for the JOP donations.[7] So the Church deposited any donations it received on the JOP's behalf—including the Debtors' $62,500 donation—into its general operating account.[8] The money from those donations was commingled with the Church's general operating revenue.[9] But the Church created a bookkeeping subaccount to separately account for those donations.[10] The Church held the funds until the JOP requested a disbursement.

Sometime in early December 2006, the JOP requested a disbursement for 45 homes ($90,000). On December 14, 2006, the Church issued a $90,000 check to Food for the Poor.[11] That check included the funds from the Debtors' $62,500 donation.[12] The Church did not retain any of the Debtors' $62,500 donation.[13]

---

[5] Adv. Doc. No. 13-1 at 2, ¶ 6.

[6] *Id.* at 2, ¶ 7.

[7] Adv. Doc. No. 30-1 at p. 24, l. 21 – p. 25, l. 9.

[8] Adv. Doc. No. 13-1 at 2, ¶ 10.

[9] Adv. Doc. No. 30-1 at p. 29, ll. 6-11.

[10] *Id.* at p. 28, l. 12 – p. 29, l. 5.

[11] Adv. Doc. No. 13-1 at 2, ¶ 11; Adv. Doc. No. 30-1 at p. 51, l. 17 – p. 52, l. 5.

[12] Adv. Doc. No. 13-1 at 2, ¶ 11.

[13] *Id.* at 2, ¶ 12.

The Trustee later filed this adversary proceeding (i) to avoid the Debtors' $62,500 transfer to the Church under Bankruptcy Code sections 544 and 548; and (ii) to recover the value of that transfer from the Church under Bankruptcy Code section 550. The parties filed cross-motions for summary judgment.

## Conclusions of Law

The Court has jurisdiction over this adversary proceeding under section 28 U.S.C. § 1334(b) and 11 U.S.C. §§ 544, 548, and 550. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (O).

Under Bankruptcy Code section 548, the bankruptcy trustee may avoid any transfer of a debtor's interest in property made within two years before the debtor filed its bankruptcy petition if the transfer was made "with actual intent to hinder, delay, or defraud" existing or future creditors.[14] Bankruptcy Code section 550(a)(1), in turn, authorizes the bankruptcy trustee to recover the value of any fraudulent transfer avoided under section 548 from the "initial transferee" of the fraudulent transfer.[15] There is no dispute that the Debtors' $62,500 donation is avoidable as a fraudulent transfer under section 548. The sole issue, then, is whether the Trustee can recover the value of that transfer from the Church as an "initial transferee" under section 550(a)(1).

Unfortunately, the "term 'initial transferee' is a term of art whose meaning in any given transaction is not always straightforward."[16] Making matters worse, the Bankruptcy Code does

---

[14] 11 U.S.C. § 548(a)(1) (2010).

[15] 11 U.S.C. § 550(a)(1) (2010).

[16] *Andreini & Co. v. Pony Express Delivery Servs. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2006).

not define the term "initial transferee," and there is no legislative history clarifying its meaning.[17] The literal interpretation of that term, of course, means the first recipient of the debtor's transfer.[18] But applying the literal meaning can lead to harsh or inequitable results because in many instances the initial recipient may have nothing to do with the debtor's property other than facilitating its transfer.[19] So courts have developed a variety of tests to avoid that result.

Most courts, including the Eleventh Circuit, have eschewed the literal meaning in favor of a "control" or "conduit" test to determine whether the recipient of an avoidable transfer of assets is the "initial transferee."[20] Under the "control" test, the recipient of an avoidable transfer is an "initial transferee" only if the recipient "exercises legal control over the assets, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under actual control of the debtor-transferor or the real initial transferee."[21] The "control" test is an equitable exception to the literal statutory meaning of "initial transferee."[22] Consequently, an initial recipient seeking to take advantage of this equitable exception must not only establish that it did not have control over the assets (*i.e.*, that the initial recipient merely served as a conduit for the assets that were under the actual control of

---

[17] *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1317 (11th Cir. 2010) (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1987)).

[18] *Id.* at 1322 (citing *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir. 1988)).

[19] *Id.* at 1320-21 (citing *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 703 (11th Cir. 2005)).

[20] *In re Pony Express*, 440 F.3d at 1300.

[21] *Id.*

[22] *In re Harwell*, 628 F.3d at 1322.

the debtor-transferor), but also that it acted in good faith and as an innocent participant in the fraudulent transfer.[23]

There is no dispute in this case that the Church acted in good faith and was an innocent participant in the Debtors' fraudulent transfer.[24] There is no record evidence—nor has the Trustee argued—that the Church was aware of the Debtors' Ponzi scheme or that the Ponzi scheme was the source of the Debtors' $62,500 donation. Nor is there any record evidence that the Church was aware the Debtors made the donation with actual intent to hinder, delay, or defraud existing or future creditors. So the only question remaining is whether the Church had "control" over the Debtors' donation.

The "control" test takes on "'special significance where the recipients of avoidable transfers are agents or fiduciaries of the debtor-transferor . . . who are duty bound to take only limited actions with respect to the funds received.'"[25] The Eleventh Circuit has expressly recognized that fiduciaries, such as banks or insurance brokers, are often "'not considered initial transferees because their control over the assets received is circumscribed by their legal duties to their clients.'"[26] Of course, fiduciaries are not immune from becoming "initial transferees."

A fiduciary or agent can become an "initial transferee" when the fiduciary or agent receives a transfer as compensation for services or as payment of a genuine debt:

> In these situations, the fiduciary or agent exercises legal control over the transferred assets because they immediately become its own assets and are not simply held for its client's purposes.[27]

---

[23] *Id.* at 1323.

[24] Adv. Doc. No. 30-1 at p. 17, ll. 4-8.

[25] *In re Harwell*, 628 F.3d at 1321 (quoting *In re Pony Express*, 440 F.3d at 1300-01).

[26] *Id.* (quoting *In re Pony Express*, 440 F.3d at 1301).

[27] *In re Pony Express*, 440 F.3d at 1301.

6

But in making that determination, the Eleventh Circuit has stressed that "'courts must look beyond the particular transfers in question to the entire circumstances of the transfers.'"[28] "The court must 'step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable.'"[29]

Although the Church is not a fiduciary like the initial recipients in *Nordberg* (a bank) or *Pony Express* (an insurance broker), the rationale behind those and other fiduciary cases applies here. Despite depositing the JOP donations into its general operating account, the Church was not free to use that money as it wished. All of the donors, including the Debtors, specifically earmarked their donations for the Project. And that is where the money ultimately went. This is not a case where the Debtors simply donated money to the Church to build a parish center or fund its general operations. The Church's use of the Debtors' donation was circumscribed by its legal obligations to the Debtors and the JOP.

The fact that the Church deposited the money into its general operating account, by itself, does not compel a finding that the Church had control over the funds. The Church separately accounted for the donations it received on the JOP's behalf. And those funds were not compensation for services or payment of a genuine debt. Besides, the Eleventh Circuit has implicitly rejected the notion that mere deposit of funds into a bank account constitutes "control."[30] Stepping back and evaluating the transaction in its entirety, the Court concludes the Church did not have control over the Debtors' $62,500 donation.

---

[28] *Id.* at 1302 (quoting *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir. 1988)).

[29] *Id.* (quoting *Nordberg*, 848 F.2d at 1199).

[30] *In re Harwell*, 628 F.3d at 1321 (quoting *In re Pony Express*, 440 F.3d at 1300-01).

**Conclusion**

Based on the foregoing, the Court concludes that the Church (i) served as a mere conduit for the Debtors' $62,500 donation; and (ii) acted in good faith and as an innocent participant in the Debtors' fraudulent transfer. Accordingly, the Trustee may not recover the value of the Debtors' $62,500 donation from the Church under Bankruptcy Code section 550(a)(1). The Court will enter a separate order granting Defendant's Motion for Summary Judgment and denying the Trustee's Cross Motion for Summary Judgment. And the Court will enter final judgment concluding this adversary proceeding in favor of the Church.

**DATED** in Chambers at Tampa, Florida, on _____July 17, 2013_____.

*/s/ Michael G. Williamson*

Michael G. Williamson
United States Bankruptcy Judge

Copies to be provided via CM/ECF.

**Cory J. Person, Esq.**
**Butler Pappas Weihmuller Katz Craig**
*Counsel for Defendant*

**Robert F. Elgidely, Esq.**
**Genovese Joblove & Battista, P.A.**
*Counsel for Plaintiff*